Filed 11/22/23  In re Daryan H. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re DARYAN H., a Person Coming Under the Juvenile Court Law. | |
| | D081297 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. JCM244448) |
| v. | |
| DARYAN H., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Rohanee Zapanta & Robert Trentacosta, Judges.  Reversed.

Aurora E. Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher Beesley and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Daryan H. appeals from the juvenile court's findings and dispositional order in which the court sustained allegations of robbery and related theft offenses and committed him to urban camp. The prosecution's case against Daryan hinged on the testimony of a single eyewitness, the robbery victim. Daryan asserts we must reverse because the court committed 11 errors, most of which involve rulings admitting or excluding evidence pertaining to the reliability of the victim's eyewitness identification. We agree with nine of Daryan's claims of error and conclude their cumulative effect was prejudicial. Consequently, we reverse the juvenile court's true findings and dispositional order.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *The Crime and Investigation*

At around 1:00 a.m. on August 5, 2022, 19-year-old Ivan M. drove his car (a gray Nissan Xterra) into an Albertson's parking lot across the street from the apartment complex where he lived. As he was parking, he saw a group of five men on one side of the parking lot. Ivan noticed the men had gotten closer as he exited his car. He then crossed the street to his apartment complex while listening to music on his iPhone.

As Ivan was climbing a flight of stairs near the complex entrance, someone struck him on the side of his head. Ivan blacked out. When he came to, he was on the ground and two people were punching and kicking him. Ivan used his hands to cover his head. After being assaulted for 15 seconds, Ivan was able to "prop" himself up. One of the assailants ran away. The other assailant raised his fists and "star[ed Ivan] right in the eyes" from a distance of around two feet. After seven seconds, that assailant fled.

2

Ivan saw both assailants run towards the Albertson's parking lot. After the assailants fled, Ivan realized his iPhone was gone. He ran to his apartment and used his mother's phone to call 911.

Ivan told the 911 dispatcher he had been robbed by two Black males. He said one was wearing a black shirt and black shorts; and the other was 18 or 19 years old, dressed in "a grey hoodie and black sweats," and had "a light mustache." In response to the dispatcher's questions, Ivan said the assailant with the black shorts had "dark skin" and the other assailant was "lighter."

Ivan was interviewed by Officer Matthew Ayster, one of the police officers who responded to the apartment complex. Based on the description Ivan gave during the interview, Ayster wrote in his police report that the first suspect was a "dark-skinned black male adult, wearing a black shirt and black basketball shorts," and the second suspect was a "light-skinned black male with a mustache, about five [feet] seven [inches tall] wearing a gray sweatshirt and black sweatpants."

Other responding officers found two people in the shopping center across the street from Ivan's apartment complex. When the two people were shown to Ivan for identification, Ivan said he did not recognize either of them.

While talking to Officer Ayster, Ivan realized his car keys and car were missing. Ivan told Ayster he had the ability to track his car through his insurance company. He agreed to contact Ayster if he was able to determine his car's location. A short time later, Ivan called Ayster and said his insurance company had tracked his car to an intersection in Spring Valley.

At approximately 2:00 a.m. on the day of the attack, a sheriff's deputy who was dispatched to that location in Spring Valley discovered Ivan's car sitting in the intersection. The deputy also found Isaac F., a "younger" Black male, standing outside the car; Jedrik Ward, a Black male, sitting in the car's

3

driver's seat; and Daryan, a "younger" White male, sitting in the car's passenger seat. The three were detained.

Officer Ayster contacted Ivan and told him that "some subjects" had been detained and his car had been located, and that officers were going to transport him to the location "to see if he could identify any of the subjects to be involved in the crime." At around 3:30 a.m., Officer Francesca Taleghani drove Ivan to Spring Valley. A field identification was conducted in which each suspect was presented to Ivan one by one as Ivan sat in the back seat of Taleghani's patrol car. During the presentation of the suspects, Ivan discussed with the officer whether he recognized the suspects as either of his two assailants.

Daryan was the first person shown to Ivan. According to the transcript of a video recorded by Officer Taleghani's bodyworn camera, when Daryan was brought out, Ivan had the following discussion with Taleghani:

"TALEGHANI:  Do you recognize him?
"[IVAN]:  That grey hoodie, yup.
"TALEGHANI:  The grey hoodie?
"[IVAN]:  Mhm (Affirmative).
"TALEGHANI:  Do you recognize the person?
"[IVAN]:  Um, *it was super dark. I could've thought he was light skinned. I thought he was an African American light skinned.*
"TALEGHANI:  Okay, I'm going to have him turn to the side, okay.
"[IVAN]:  Okay.
"TALEGHANI:  Can you turn him to the side? But that looks like him?
"[IVAN]:  That's him, yeah.
"TALEGHANI:  Okay. That's going to be a positive. He recognizes the hoodie." (Emphasis added.)

After a 33-second period of silence, their conversation continued:

"TALEGHANI:  That was the one you recognized robbed you?
"[IVAN]:  That was the one I looked dead in the face.

4

"TALEGHANI:    Okay.
"[IVAN]:       His hoodie was on though.
"TALEGHANI:    Okay,
"[IVAN]:       Like, *I could of sworn it was super dark*.
"TALEGHANI:    Okay.
"[IVAN]:       That grey hoodie[,] it was the giveaway."  (Emphasis added.)

Isaac was brought out next.  Ivan said he recognized Isaac, adding, "I thought he had a buzz cut but then again he was standing in a dark area."

Ward was the last person presented.  According to the transcript of Officer Taleghani's bodyworn video, when Ward was brought out, Taleghani and Ivan had the following conversation:

"TALEGHANI:    . . . .  Okay, so this is the third one.  Uh, do you recognize this guy at all?
"[IVAN]:       Um, that was the guy I described at first.
"TALEGHANI:    This guy?
"[IVAN]:       *I think I mixed him up with the first one.*
"TALEGHANI:    So, you think this guy-
"[IVAN]:       Was the first.
"TALEGHANI:    Is the first-
"[IVAN]:       (Unintelligible), they were wearing such similar things.  They're both wearing grey hoodies, but they had the hood on, and *it was so dark*.
"TALEGHANI:    Okay, so you think this one is-
"[IVAN]:       I- do you know tall [*sic*] he is because I know the only reason I'm more sure of the first one is because he was about my height.
"TALEGHANI:    Okay. Well, if you think that, if your [*sic*] more sure on the first one then [*sic*] this one its totally fine but I need a- I either need a yes or no for this one.
"[IVAN]:       Can you move him to the side?  (Unintelligible).
"TALEGHANI:    I mean, how tall are you?
"[IVAN]:       I'm 5'7.
"TALEGHANI:    Okay, well that-
"[IVAN]:       He is pretty tall.
"TALEGHANI:    Yeah, he looks pretty tall.
"[IVAN]:       Yeah, so it's probably the first one then."  (Emphasis added.)

The police took photographs of the three suspects later that morning, which were confirmed to depict their appearance at the time they were detained in Spring Valley. The photographs showed Isaac was wearing a black hoodie and dark-colored pants; Ward was dressed in a light-colored hoodie and black pants; and Daryan was wearing a gray hoodie and blue jeans. Daryan was 17 years old, five feet five inches tall, and 120 pounds at the time of his detention. The record does not contain information about Ward's age, height, or weight.

Law enforcement attempted to identify surveillance videos of the scene of the robbery. The only such video that could be located came from cameras in the Albertson's parking lot. In the video, silhouettes of people could be seen running toward Ivan's car around the time of the crime, but it was not possible to identify them due in part to the quality of the video.

II.

*The 602 Petition and Adjudication Hearing*

On August 8, 2022, a Welfare and Institutions Code section 602 petition was filed alleging Daryan had committed the following four offenses: robbery (Pen. Code, § 211; count 1); felony vehicle theft (Veh. Code, § 10851, subd. (a); count 2); receipt of a stolen vehicle (Pen. Code, § 496d; count 3); and receipt of stolen property other than a vehicle (Pen. Code, § 496, subd. (a); count 4). The adjudication hearing occurred on October 13 and 14, 2022.

A. *Prosecution's Witnesses*

Ivan testified he saw the face and clothing of the second assailant who stood two feet from him after the first assailant ran away. He described this assailant as wearing "a gray sweatshirt with a hoodie on and black sweats" or "black pants." He added this assailant also had a "very small" mustache, was about five feet nine inches tall and 160 pounds, and had "a sort of buzz cut,"

6

eyes that were "very distinct" and "on the larger size [*sic*]," and a "[r]ound" head.

The prosecution did not introduce the audio recording of Ivan's 911 call or the video recording from Officer Taleghani's bodyworn camera that contained Ivan's statements during the Spring Valley field identification. Instead, the prosecutor had Ivan testify about his earlier statements to law enforcement from memory. Ivan recalled telling "the police" one of his assailants was a "Caucasian male"[1] who was "about, five-nine, in a gray hoodie and black pants"; and the other assailant was "about five-eleven, six foot, black male, with a black hoodie and black pants."

Ivan was also asked to describe the field identification conducted at the "location of [his] car" from memory. He testified he had recognized the "first individual" (Daryan) based on his clothing; specifically, he recognized this individual's "[g]ray hoodie and black pants." The prosecutor asked Ivan whether he had noticed "anything different" about this person. Ivan responded, "The face was a little lighter." Asked to explain this answer, Ivan elaborated: "His skin was a little lighter. When we were looking at each other with our hands up, there was a floodlight on his face . . . . Although that floodlight is a pretty dark orange, so luminescent. It just gave me a different tone of his face." The prosecutor showed Ivan a photograph of Daryan from the Spring Valley field identification. In response, he testified, the photograph showed "the individual who attacked me."

---

[1]  As we shall discuss, there was no evidence (other than Ivan's testimony at the adjudication hearing) that Ivan told anyone on the morning of the attack that one of his assailants was a White or Caucasian male.

The prosecutor questioned Ivan about the third suspect who was presented to him (Ward). Ivan testified he had not recognized this person because "[h]e had a darker skin tone. He was taller. That was about it."

The prosecutor asked Ivan whether he would still recognize "the individual [who] was right in front of [him] after [he] stood up from the attack." Ivan said he would. The prosecutor then asked Ivan whether he recognized anybody in the courtroom as "that person." In response, Ivan identified Daryan.

On cross-examination, Ivan agreed his "testimony today" was that he told the 911 dispatcher the assailant in the gray hoodie was Caucasian. He reiterated that the attack occurred under a floodlight and testified he did not recall telling the police dispatcher that the area of the attack was dark. Defense counsel then played the audio recording of Ivan's 911 call. Afterward, Ivan agreed he never told the 911 dispatcher that any of the suspects were Caucasian.

Defense counsel asked Ivan about his field identification of the first suspect (Daryan). Ivan said he recalled telling the police officer when looking at the first suspect, "I thought he was an African American light skin." He agreed he had said the suspect's gray hoodie was the "give-away." He did not remember telling the officer it was "super dark."

Officer Ayster testified next. The prosecutor's questions focused primarily on Ayster's efforts to find Ivan's stolen car and iPhone. Ayster testified Ivan's phone was recovered from one of the suspects' backpacks "at the Spring Valley location," but he could not recall whose backpack.

On cross-examination, defense counsel asked Officer Ayster about the Spring Valley field identification. Ayster agreed he told Ivan beforehand that "the car had been located with three males." He acknowledged the San Diego

8

Police Department policy and procedure manual states that curbside lineups should not be suggestive in any way. Ayster further agreed that during his interactions with Ivan, Ivan never mentioned a White or Caucasian suspect, nor did Ivan say an orange flood light may have skewed his perception of the attackers. Ayster agreed that Ward was wearing "dark or black pants," while Daryan was wearing blue jeans. Over defense counsel's objection, the juvenile court allowed Ayster to add that "it was dark" and "[t]he victim could easily have construed those as black instead of blue."

Finally, a sheriff's deputy testified about finding Ivan's car in Spring Valley and apprehending the three suspects. An investigator from the District Attorney's office described the efforts taken to locate surveillance footage of the robbery, and confirmed it was not possible to identify the suspects in the surveillance video recovered due in part to the quality of the footage.

B.  *Defense Witnesses*

Dr. John Wixted, a psychology professor who conducts research on eye-witness memory, testified on behalf of the defense as an expert on memory and eyewitness identification. He discussed a range of subjects, including the manner in which memories are created and retrieved and the factors that made eyewitness identifications reliable (or unreliable).

Dr. Wixted explained a memory starts with a sensation or perception that activates specialized regions of the brain. The memory of that perception is then encoded and stored in the brain until it is later retrieved. He identified factors that may impact the encoding of a memory. As one example of such a factor, he testified that, "If this room was dark, I couldn't encode your face." Another factor is stress. Wixted also discussed factors that affect the retrieval of memory. Memories remain dormant until a

9

retrieval cue that matches a particular memory "comes along" at which point the memory is called to conscious awareness. The main variable that affects memory retrieval is the degree to which a particular retrieval cue overlaps with the memory that was initially encoded.

Dr. Wixted identified the conditions that make an eyewitness identification reliable. He testified: "[T]he most important factor is by far which memory test you focus on. There is always a first test. [¶] . . . [I]f you want the most reliable information from memory, it's essential to focus on the results of that first test." He explained the confidence of the eyewitness's identification in response to this first test is the most important indicator of the accuracy of the identification. The eyewitness's words coupled with the immediacy of their identification are determinants of the confidence of a particular identification. Words like "[t]hat's him, I'll never forget that face, not a doubt in my mind" or "I'm a hundred percent sure" express high confidence. Wixted testified that "on the first test, immediate [identification] with high confidence is very reliable." On the other hand, "[Identifications] made with low confidence and with some hesitancy are very unreliable, even if they do land on the suspect."

Dr. Wixted testified the type of test administered also affects the reliability of an eyewitness identification. A photographic lineup is the best way to test eyewitness memory. A showup in which suspects are presented individually, on the other hand, "is not the optimal way to test memory." According to Wixted, an eyewitness's identification of a suspect with high confidence, if made during a showup, has been determined in studies to be correct only 75 to 90 percent of the time. Subsequent tests of the eyewitness's memory should not be relied upon, according to Wixted, because the first memory test has the effect of familiarizing the eyewitness with the suspect.

10

He explained: "What happens over and over and over again in eye witness identification cases, is witnesses misattribute that familiarity to the crime. . . . By the time they get to court, the face that they're identifying in front of a judge and jury is extremely familiar and sometimes extremely strongly associated with the crime. And multiple lines of research converge on this conclusion . . . including the many DNA exoneration cases[.]"

The defense called Officer Taleghani to testify about her role in the Spring Valley field identification. At around 3:30 a.m. on August 5, 2022, Taleghani transported Ivan to Spring Valley to view the suspects found with Ivan's car. When Taleghani and Ivan arrived at the scene, Taleghani read him a curbside lineup admonishment. Then, as Ivan sat in the back seat of her patrol car, the suspects were presented to him one by one, starting with Daryan.

Officer Taleghani testified that Ivan identified the first suspect, Daryan, as a person involved in the robbery. However, she was initially unable to remember whether Ivan mentioned the lighting conditions in which he first saw the first suspect, or the fact that he initially described the suspects as two Black males.

Officer Taleghani confirmed she activated her bodyworn camera during the field identification. Defense counsel asked Taleghani whether watching the footage would refresh her memory. After she said it would, the juvenile court permitted defense counsel to play the video. But when defense counsel moved to admit the video in evidence, the court denied the motion. The court stated it would consider the video only "as a demonstrative with regard to [Officer Taleghani's] testimony and what she stated."

On further questioning by defense counsel, Officer Taleghani testified the video had refreshed her memory, and that Ivan had said "it could have

11

been a light-skinned African" when Daryan was presented to him. She also agreed that when Ivan identified Daryan, he said the lighting conditions where the attack occurred were "super dark" and the first thing he identified was Daryan's gray hoodie. She further testified that when Ward was presented, Ivan was "confused at first." When defense counsel asked her to elaborate, the prosecutor objected on hearsay grounds, and the juvenile court sustained the objection.

C.    *Juvenile Court's Findings*

In his closing arguments, the prosecutor asked the court to find true the allegations in the petition that Daryan committed all four charged offenses. The prosecutor argued Ivan's identification of Daryan as one of his attackers supported the conclusion Daryan committed the robbery that resulted in the taking of Ivan's iPhone as charged in count 1 and "helped facilitate the taking of that car" as charged in count 2. With respect to the receipt of stolen property offenses alleged in counts 3 and 4, the prosecutor argued Ivan's identification of Daryan supported the conclusion Daryan hit and kicked Ivan, which facilitated the theft of Ivan's iPhone and car.

The juvenile court returned true findings as to all four counts alleged in the petition. The court found it was "undisputed" Ivan made a "quick identification" of Daryan and that Ivan's "own words of recognizing Daryan's face after, quote, looking him dead in the face" were "unprovoked." The court was not persuaded Ivan's identification of Daryan was unreliable or subject to source misattribution, explaining the 911 audio recording showed that Ivan was able to "follow instructions" and "engage[ ] with the dispatcher" even though he was under stress, and that the steps Ivan subsequently took to find his property showed he remained "reasonable and logical." The court found Ivan "consistently recalled articles of clothing" and had identified

12

Daryan by "recall[ing] the gray hoodie" and making "the unprovoked statement: I looked him dead in the face."

At the dispositional hearing, the juvenile court declared Daryan a ward of the court and ordered him committed to urban camp for a period not to exceed 85 days, followed by a term of juvenile probation.

## DISCUSSION

Daryan identifies 11 trial errors, 10 of which involve rulings on the admissibility of evidence, and seeks reversal on the ground the court's errors were cumulatively prejudicial. As we shall explain, we conclude the juvenile court committed eight errors and their cumulative effect were prejudicial.

### I.

### *Error Nos. 1 through 4*

Daryan challenges four rulings in which the juvenile court sustained hearsay objections made by the prosecutor during defense counsel's cross-examination of Ivan. "We review evidentiary rulings, including ultimate rulings on whether evidence should be excluded as hearsay, for abuse of discretion." (*People v. Caro* (2019) 7 Cal.5th 463, 503.) We conclude Daryan's claims have merit.

A. *The Rulings*

While cross-examining Ivan, defense counsel asked Ivan about his reaction when Ward was presented during the Spring Valley field identification. The juvenile court sustained four hearsay objections asserted by the prosecutor, as follows:

Hearsay Objection No. 1

"[Defense]      When asked if you recognize[d] [Ward], you said, 'I think that was the person I described first.'
"[Ivan]          Yes, sir.
"[Prosecutor]: Object. Hearsay.
"[Court]:        Sustained.

13

"[Prosecutor]:  Motion to strike, your Honor.
"[Court]:       That will be stricken.
"[Defense]:     When presented with this third person, you thought this third person might have been the first person you described to the police, the gray-hoodie person?
"[Ivan]:        Yes, sir."


Hearsay Objection No. 2

"[Defense]:     You believed you might have been mixing up this third person you saw with the first person that you were shown and identified?
"[Ivan]:        Yes.
"[Prosecutor]:  Objection.  Foundation.  Hearsay.
"[Court]:       Sustained on hearsay.  [¶]  Can you ask a different question? Was there a motion as to the response?
"[Prosecutor]:  Yes, your Honor.  Motion to strike.
"[Court]:       That will be granted.  That response will be stricken.  [¶] Different question.
"[Defense]:     You believe this third person that you were being shown at that moment might have actually been the first person that you identified or that you picked out when presented with that?
"[Ivan]:        Initially."

Hearsay Objection No. 3

"[Defense]:     You then started asking the police officer how tall this third person was?
"[Ivan]:        Yes, sir.
"[Defense]:     Because you thought maybe the height of the third person could help you decide if this third person was in fact the gray-hoodie person that attacked you?
"[Ivan]:        Yes, sir.
"[Defense]:     The officer told you this third person was pretty tall?
"[Ivan]:        Yes.
"[Prosecutor]:  Objection.  Hearsay.
"[Defense]:     Effect on the listener, your Honor.
"[Court]:       Sustained.  [¶]  Is there a motion with regard to the response?
"[Prosecutor]:  Yes, your Honor.  Motion to strike.

14

"[Court]:        That will be granted.  [¶]  Different question, [defense counsel].

"[Defense]:     Fair to say that you I guess ruled out this third person that you were shown because you believed that they were taller than the person you recall attacking you in the gray hoodie?

"[Ivan]:        Yes, sir."

            Hearsay Objection No. 4

"[Defense]:     The last thing you told the officer about or the last thing you told the officer in that conversation when presented with this third person is that it was probably the first person you identified?

"[Prosecutor]: Objection.  Hearsay.

"[Court]:       Sustained.  [¶]  Is there any --

"[Prosecutor]: Motion to strike, your Honor.

"[Court]:       Granted.  [¶]  Any additional questions, [defense counsel]?

"[Defense]:     Yes, your Honor.  [¶] When you ruled out this third person, you were more convinced that it was the first person that you were shown?

"[Ivan]:        Yes, sir."

B.      *The Juvenile Court Abused Its Discretion by Sustaining the Prosecution's Second and Third Hearsay Objections*

Daryan contends the juvenile court abused its discretion by sustaining the second and third hearsay objections because the information elicited was not hearsay.  The People do not dispute these contentions.

We agree with the People's implicit concession of error.  The prosecutor asserted the second hearsay objection in response to defense counsel's question asking Ivan whether he "believed" he may have been mixing up the third suspect (Ward) with the first one (Daryan).  This question did not call for hearsay.  Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the

15

truth of the matter stated." (Evid. Code,[2] § 1200, subd. (a).) "Statement," in turn, means an "oral or written verbal expression" or "nonverbal conduct of a person intended by him [*sic*] as a substitute for oral or written verbal expression." (§ 225.) Defense counsel asked Ivan about his internal belief, not his outward expression of that belief. Accordingly, defense counsel's question did not seek to elicit evidence of an out-of-court "statement" and thus did not violate the rule against admitting hearsay. (§ 1200.)

Although the People do not dispute the ruling was erroneous, they contend Daryan forfeited his current challenge by neglecting to raise it before the juvenile court. The rule the People rely on is as follows: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that . . . [t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means[.]" (§ 354, subd. (a).) Our high court has held the necessary offer of proof must include any argument that the evidence is admissible non-hearsay. (See, e.g., *People v. Fauber* (1992) 2 Cal.4th 792, 854 (*Fauber*) [defendant forfeited challenge to ruling sustaining hearsay objection by failing to assert the ground of admissibility advanced on appeal, as required by § 354, subd. (a)].)

The People's argument, however, overlooks subdivision (c) of section 354, which expressly provides the offer-of-proof requirement does not apply where "[t]he evidence was sought by questions asked during cross-

---

[2]     All further undesignated statutory references are to the Evidence Code.

16

examination or recross-examination." (See *People v. Hardy* (2018) 5 Cal.5th 56, 103 (*Hardy*) [" 'Normally, if the trial court excludes evidence on cross-examination, no offer of proof is necessary to preserve the issue for consideration on appeal' "].) As the provision the People rely upon does not apply to the circumstance before us, and they offer no other reason why we should find the matter forfeited, we reject their claim that Daryan has forfeited his challenge to the trial court's second hearsay ruling.

Turning to the third hearsay ruling, the juvenile court sustained the prosecutor's hearsay objection when defense counsel asked Ivan, "The officer told you this third person was pretty tall?" Once again, the People do not oppose Daryan's challenge to this ruling. We agree with their implied concession the court abused its discretion.

"Evidence of an out-of-court statement may be admitted for the nonhearsay purpose of showing its effect on the listener so long as that effect is relevant to an issue in dispute." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1115 (*Ramirez*).) As defense counsel explained in his counter to the People's hearsay objection, the officer's statement was offered for its effect on Ivan, not to prove Ward was "pretty tall." This effect was relevant to the validity of Ivan's identification of Daryan as the assailant in the gray hoodie, the sole issue in dispute at trial. Ivan testified Ward's height was a factor that influenced him in ultimately deciding the assailant in the gray hoodie was Daryan rather than Ward. Evidence that the officer commented on Ward's apparent height as Ivan was making this decision had a tendency in reason to show Ivan's selection was influenced by the officer's comment. Thus, the statement defense counsel sought to elicit was not made inadmissible by the hearsay rule because it was offered for a nonhearsay purpose and was "relevant to an issue in dispute." (*Ibid.*)

17

C.	*The Juvenile Court Abused Its Discretion by Sustaining the Prosecution's First and Fourth Hearsay Objections*

Daryan contends the juvenile court abused its discretion by sustaining the first and fourth hearsay objections because the out-of-court statements defense counsel sought to elicit fell within the following exceptions to the hearsay rule: sections 1250 (state of mind of declarant), 1238 (prior identification of a criminal suspect), and/or 1202 (prior inconsistent statement).

The People claim these contentions have been forfeited because Daryan's defense counsel did not cite these hearsay exceptions to the juvenile court. Once again, however, the People's forfeiture claim incorrectly relies on section 354, subdivision (a), as well as two cases in which challenges to hearsay rulings were deemed forfeited for failure to comply with the preservation requirements in section 354, subdivision (a). (See *People v. Hines* (1997) 15 Cal.4th 997, 1034, fn. 4 [citing *Fauber*, *supra*, 2 Cal.4th at p. 854, and holding a challenge to the validity of a ruling excluding a statement as hearsay was forfeited where trial counsel failed to identify the pertinent hearsay exception at the time of the ruling]; *People v. Livaditis* (1992) 2 Cal.4th 759, 777–778 (*Livaditis*) [defense forfeited challenge to trial court's rulings sustaining prosecutor's hearsay objections during questioning of defense witnesses by failing to comply with § 354, subd. (a), by showing the testimony came within an exception to the hearsay rule].) As we have explained, the requirements of subdivision (a) of section 354 do not apply where, as here, the challenged ruling results in the exclusion of evidence "sought by questions asked during cross-examination or recross-examination." (*Id.*, subd. (c); *Hardy*, *supra*, 5 Cal.5th at p. 103.) We again reject the People's claim that Daryan's appellate contentions have been forfeited.

18

Turning to the merits of Daryan's arguments, we first consider his challenge to the juvenile court's first ruling sustaining the prosecution's hearsay objection to defense counsel's question, "When asked if you recognize [the third person brought out by law enforcement], you said, 'I think that was the person I described first.'" Because we agree Daryan's statement met the conditions for admissibility under section 1250's exception for state of mind and the court abused its discretion by excluding it, we do not consider whether it was also admissible under sections 1238 or 1202.

Section 1250 provides in relevant part that "evidence of a statement of the declarant's then existing state of mind . . . is not made inadmissible by the hearsay rule when . . . [t]he evidence is offered to prove the declarant's state of mind . . . when it is itself an issue in the action." (§ 1250, subd. (a)(1).) Ivan's statement, "I think that was the person I described first," fell within this exception to establish his immediate impression upon seeing Ward, which was a relevant state of mind. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1025–1026 [witness testified a red Mustang driven by defendant was memorable to her because a neighbor had told her about an incident involving a similar car; held, the neighbor's statement was admissible under § 1250, subd. (a), to establish "the reason [the witness] noticed and remembered the red Mustang, i.e., a relevant state of mind"]; *People v. Suff* (2014) 58 Cal.4th 1013, 1077 [a mother's statements about the reasons she would not testify at her son's trial were admissible to establish the mother's state of mind].)

The People contend Ivan's statement was inadmissible under subdivision (b) of section 1250, which provides that evidence of a statement of a declarant's memory or belief about an event that preceded the statement is not admissible "to prove the fact remembered or believed." We disagree.

19

This rule precludes admission of a statement of memory or belief concerning a *past* event. (See Cal. Assem. Comm. on Judiciary com., 29B pt. 4 West's Ann. Evid. Code (2015 ed.) foll. § 1250, p. 420.) Ivan's statement upon seeing Ward, "I think that was the person I described first," did not fall within this rule because it was an expression of Ivan's *then current* belief that Ward (whom Ivan was viewing when he made the statement) was the gray-hoodie-wearing assailant, not a statement of a *past* belief concerning Ward's identity.

Finally, Daryan's last challenge pertains to the juvenile court's fourth ruling sustaining the prosecution's hearsay objection to defense counsel's question whether the last thing Ivan told the officer "when presented with this third person is that it was probably the first person you identified?" Daryan contends that excluding the evidence of Ivan's statement was an abuse of discretion because the statement was admissible to establish Ivan's state of mind pursuant to section 1250 and as a prior inconsistent statement under section 1202. Because we agree the statement fell within the state of mind exception, we do not need to consider its admissibility as a prior inconsistent statement.

Ivan's declaration was an expression of the current state of his evolving effort to determine whether Ward or Daryan was the gray-hoodie-wearing assailant—in other words, it was an expression of his "then existing state of mind." (§ 1250, subd. (a).) And Ivan's language, particularly his use of the word "probably," was critical to supporting the defense theory that Ivan's identification of Daryan was made with less than complete confidence, which in turn (according to the defense expert) was evidence increasing the likelihood the identification was inaccurate. (§ 1250, subd. (a)(1).) The statement was therefore admissible state-of-mind evidence. (*Ibid.*)

20

The People contend Ivan's assertion was inadmissible under subdivision (b) of section 1250 because it was evidence of a fact remembered or believed. We have already rejected this contention. Ivan's declaration was an expression of his *present* belief about the identity of the gray hoodie wearing assailant, not a statement of memory or belief concerning a past event. (See Cal. Assem. Comm. on Judiciary com., 29B pt. 4 West's Ann. Evid. Code (2015 ed.) foll. § 1250, p. 420.)

## II.

### *Error No. 5*

Daryan's next claims pertain to defense objections to two questions posed by the prosecutor during redirect examination of Ivan: (1) "So was the third person just too tall based on what you remembered about the two individuals who had attacked to [*sic*] you?" and (2) "So are you saying you basically didn't register the third person the same way or don't remember them as strongly as the first person that was presented to you?" Daryan argues the juvenile court's rulings violated section 767 because the questions that elicited the objections were impermissibly leading and unduly suggestive. We agree as to the first question (error no. 5) but not the second.

A question is "leading" if it "suggests to the witness the answer that the examining party desires" (§ 764) " ' "or puts into his mouth words to be echoed back" ' " (*People v. Williams* (1997) 16 Cal.4th 635, 672 (*Williams*)). Under section 767, subdivision (a)(1), "leading questions 'may not be asked of a witness on direct or redirect examination' except in 'special circumstances where the interests of justice otherwise require.' " (*Williams*, at p. 672).) The danger of permitting a lawyer to ask leading questions of his or her own witness is that the lawyer will succeed in improperly suggesting to the witness how to testify. (See 3 Witkin, Cal. Evidence (6th ed. 2023) § 189, p. 259.) " 'When the danger [of false suggestion] is present, leading questions

21

should be prohibited; when it is absent, leading questions should be allowed.' " (*Williams*, at p. 672.)

The prosecutor's first leading question was unduly suggestive, resulting in the very danger the prohibition on leading questions is meant to prevent. The prosecutor asked Ivan whether Ward was "just too tall *based on what you remembered*[.]" (Italics added.) By the time the prosecutor asked this question, the juvenile court had already excluded from evidence (by sustaining the prosecutor's hearsay objection during the defense cross-examination of Ivan) that Officer Taleghani told Ivan the third suspect, Ward, "looks pretty tall." This left unexplained the reason why Ivan decided Ward was too tall. The prosecutor's question supplied the missing answer: Ivan came to his decision based on his own memory, not the officer's comment. The prosecutor's question thus had the effect of bolstering the credibility of Ivan's identification by introducing evidence it was self-generated rather than prompted by the officer's comment. Accordingly, the prosecutor's leading question "should [have] be[en] prohibited." (*Williams, supra*, 16 Cal.4th at p. 672.)

Although the prosecutor's second question was leading, it was not unduly suggestive. Instead, it was a fair summary of concepts Ivan conveyed in his earlier responses. As a result, we conclude the juvenile court acted within its discretion when it overruled defense counsel's objection to this question.

### III.

### *Error No. 6*

Daryan's next claim of error arises from defense counsel's cross-examination of Officer Ayster. After defense counsel showed Ayster a photograph of Daryan from the morning of the attack, defense counsel asked Ayster to confirm Daryan was "[c]learly not wearing black jeans or black

22

sweatpants[.]" In response, Ayster testified: "That could be -- he was not wearing those black jeans, but based off of the lighting in the area of where the attack occurred, it was dark. The victim could easily have construed those as black instead of blue." Defense counsel objected that Ayster's testimony lacked foundation and was nonresponsive. The juvenile court overruled the objection and directed defense counsel to ask his "[n]ext question."

Daryan contends his counsel's objection should have been sustained. The People argue that Officer Ayster's answer was entirely responsive and based on his personal knowledge. Daryan has the better argument.

Under section 766, "A witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of any party." Further, "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter" and "[a]gainst the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter." (§ 702, subd. (a).) "Personal knowledge" means "a present recollection of an impression derived from the exercise of the witness' own senses." (Cal. Law Revision Com. com., 29B. pt. 2A West's Ann. Evid. Code (2019 ed.) foll. § 702, p. 416.)

We agree in part with Daryan's contention that Officer Ayster's answer was nonresponsive and lacked foundation. Ayster was asked only whether it was clear from the photograph shown to him that Daryan was not wearing black jeans or black sweatpants. This fact was important to the defense since Ivan's identification of Daryan as a perpetrator of the robbery was largely based on his clothing—the gray hoodie—and yet Ivan had described the second assailant as wearing a gray hoodie *and* black pants, and Daryan was not wearing black pants. Ayster answered defense counsel's question and

agreed Daryan was not wearing black pants or black sweatpants, but he did not stop there. He added to his response and attempted to explain the mismatch by attributing Ivan's description to the lighting where the attack occurred and speculating that Ivan "could easily have construed those as black instead of blue." Besides the speculation, this additional information was outside the scope of defense counsel's question.

The next question is whether the nonreponsive portion of Officer Ayster's answer was also lacking in foundation. For Ayster's testimony about the lighting where the robbery occurred to be admissible, he needed to have personal knowledge of the conditions he described. The People claim he did and direct us to a page of the reporter's transcript that purportedly shows Ayster had personal knowledge of the lighting conditions where the attack occurred. But the cited testimony merely establishes that Ayster was on patrol the morning of August 5, 2022, and responded to the address of Ivan's apartment complex after receiving a radio call for assistance. It does not establish that Ayster visited the stairway where Ivan was robbed or observed the lighting in that area.

Further, the People do not argue or attempt to demonstrate that Officer Ayster had personal knowledge for his testimony that Ivan "could easily have construed" his assailant's pants as black instead of blue. "[T]he testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter" (§ 702, subd. (a)), and the People have not established that this requirement was met. We conclude the juvenile court abused its discretion by admitting testimony that was nonresponsive and lacking in foundation over defense counsel's objection.

24

## IV.

### *Error No. 7*

Next, Daryan contends the juvenile court erred and abused its discretion by excluding Officer Taleghani's bodyworn camera video footage from evidence. As we have noted, the defense sought to admit in evidence the video footage that showed Ivan as he viewed the suspects and spoke with Taleghani during the Spring Valley field identification. After Taleghani was unable to recall whether Ivan referred to the lighting conditions in which he saw the suspects, or to the fact that he initially described the suspects as two Black males, defense counsel had her confirm that her bodyworn camera was activated during the Spring Valley field identification and captured Ivan's statements as he viewed the suspects. She did so and agreed watching the footage would refresh her memory.

Defense counsel then told the juvenile court his intent was to play the entire video and to have it admitted in evidence. The prosecutor objected that the video contained inadmissible hearsay and constituted improper impeachment of Ivan. The court refrained from ruling on these objections and permitted defense counsel to play the video as he continued questioning Officer Taleghani. Defense counsel stated he had copies of a transcript of the video footage to provide the court as well as the prosecution, and, with the court's permission, handed one of them to Taleghani.

Defense counsel then played the video, pausing it periodically to ask questions. Officer Taleghani confirmed that it accurately captured her conversation with Ivan as he was shown each of the three suspects. She also testified the video had refreshed her memory, and that Ivan had said "it could have been a light-skinned African" when Daryan was shown to him.

After he finished playing the video, defense counsel moved to admit the video as well as the transcript in evidence. Over the course of a lengthy

25

bench ruling, the juvenile court denied the motion. Initially, the court stated "[f]or the record" that it had not been provided a copy of the video transcript. The court said it found the audio of Officer Taleghani to be "clear," while "[t]he audio of . . . the other person speaking [i.e., Ivan] was not." The court told defense counsel it was "prepared to receive the exhibit" only "as it relates to Officer Taleghani's statement[s]." Defense counsel asked the court whether it would like to look at the transcript of the video. The court did not directly respond to this question. Instead, it reiterated that it found Ivan's statements "unintelligible" and suggested it would consider the video, but only "as a demonstrative with regard to [Taleghani's] testimony[.]"

The court then turned to the prosecutor, who renewed his hearsay objection, explaining that "there was a lot in [t]here that doesn't qualify as a present sense impression from the victim as well as this officer." Defense counsel countered that the video showed Officer Taleghani's "reaction to what Ivan M[.] was saying at that exact moment in time," as well as Ivan's "demeanor . . . [and] present sense impressions" as he was presented with the three suspects. Defense counsel added that the video also "could come in under prior inconsistent and prior consistent statements as to [Ivan's] identification given the direct and cross-examination of [Ivan] that was made earlier today."

In its final ruling, the juvenile court sustained the prosecutor's hearsay objections and denied the defense motion to admit the video in evidence, noting that Ivan had been "cross-examined with impeachment evidence." The court stated, however, that it had "taken that item into consideration as demonstrative, coupled with the information by Officer Taleghani's testimony."

26

Daryan contends Ivan's statements contained in the footage were relevant and admissible under the hearsay exceptions for a prior identification by a witness (§ 1238), state of mind evidence (§ 1250), and/or prior inconsistent statements (§ 1202), and Officer Taleghani's statements were admissible to show their effect in eliciting responses from Ivan (§ 1200).

Neither side has taken the position that the juvenile court's decision to treat the video footage as demonstrative evidence can be equated with a decision to consider it as substantive evidence. Instead, both parties interpret the court's ruling as excluding the footage from evidence. We agree with their assessment. The phrase "demonstrative evidence" generally refers to materials such as maps, charts, diagrams, or computer animations that "illustrate a witness's testimony." (See *People v. Mills* (2010) 48 Cal.4th 158, 207 [listing maps, charts, and diagrams as examples of demonstrative evidence]; *People v. Tran* (2020) 50 Cal.App.5th 171, 187 [explaining that computer animations are " 'demonstrative evidence offered to help a jury understand expert testimony or other substantive evidence' "].)

By denying the defense motion to admit the video while indicating it would consider the video as "demonstrative, coupled with the information by Officer Taleghani's testimony," the juvenile court appeared to consider the video for the limited purpose of illustrating Taleghani's in-court testimony while excluding it as substantive evidence. The effect of this ruling was that the court did not consider the video as independent evidence of the statements of Ivan or Taleghani during the Spring Valley field identification. The question is whether this was an abuse of the court's discretion. We conclude that it was.

More than 60 years ago, the California Supreme Court held that evidence of a prior identification made by a witness who could not repeat the

identification at trial was admissible "as independent evidence of identity." (*People v. Gould* (1960) 54 Cal.2d 621, 626 (*Gould*), overruled on another ground by *People v. Cuevas* (1995) 12 Cal.4th 252, 271–272; see Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (2015 ed.) foll. § 1238, p. 365; 1 Witkin, Cal. Evidence (6th ed. 2023), Hearsay, § 178(2), pp. 958–959.)  "Unlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached [citations], evidence of an extrajudicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind." (*Gould*, at p. 626.) Moreover, "[t]he failure of the witness to repeat the extrajudicial identification in court does not destroy its probative value, for such failure may be explained by loss of memory or other circumstances." (*Ibid.*)

When it enacted the Evidence Code in 1965, our Legislature codified these principles from *Gould*.  (See Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (2015 ed.) foll. § 1238, p. 365; 1 Witkin, Cal. Evidence (6th ed. 2023), Hearsay, § 178(3), p. 959.)  Under section 1238, "[e]vidence of a statement previously made by a witness is not made inadmissible by the hearsay rule" if the statement is an identification of a person as someone who participated in a crime (*id.*, subd. (a)); the statement was made at a time when the crime was fresh in the witness's memory (*id.*, subd. (b)); and the evidence of the statement "is offered after the witness testifies that he made the identification and that it was a true reflection of his opinion at that time" (*id.*, subd. (c)).

Here we have the reverse situation from *Gould*: the victim made a prior out-of-court identification that was equivocal and followed it with a more confident identification at trial. Yet the principles that supported admission in *Gould* are no less applicable here.

Ivan's out-of-court statements from the video footage identifying Daryan as one of his two assailants are admissible prior identification evidence.[3] The conditions of admissibility under section 1238 are met, at least with respect to Ivan's assertions to Officer Taleghani that Ivan was able to "see him"; recognized "[t]hat grey hoodie"; believed "[t]hat's him"; and concluded "[t]hat was the one I looked dead in the face" because "[t]hat grey hoodie it was the giveaway." These were statements in which Ivan identified Daryan as "a person who participated in a crime," (*id.*, subd. (a)); they were made soon after the assault, when the crime was still fresh in Ivan's mind (*id.*, subd. (b)); and Ivan confirmed at trial that he made the prior identification and that these statements were "a true reflection of his opinion at that time" (*id.*, subd. (c)).

Ivan's other assertions regarding his identification of Daryan ("Um, it was super dark. I could've thought he was light skinned. I thought he was an African American light skinned"; "His hoodie was on though"; and "Like, I could of sworn it was super dark") tended to reveal hesitation or uncertainty. To the extent Ivan's trial testimony characterized his prior identification of

---

[3] On June 28, 2023, Daryan filed with this court a request for transmittal of the video footage and associated transcript pursuant to rule 8.224 of the California Rules of Court. However, because the items were not admitted in evidence, they were not retained by the juvenile court and were not available for transmittal. We separately received a copy of the transcript, however, via a motion to augment filed by Daryan which we granted on March 23, 2023.

Daryan as more confident than these statements would suggest, subdivision (c) of section 1238 was not satisfied. (See § 1238, subd. (c) [declarant must affirm the prior identification "was a true reflection of his opinion at that time"].) However, these statements were nevertheless admissible as circumstantial evidence of Ivan's state of mind at the time of the Spring Valley field identification. (See 1 Witkin, Cal. Evid. (6th ed. 2023), Hearsay, § 44, p. 791 [explaining that the hearsay rule does not apply to statements that "are not express declarations of belief, intent, or other state of mind" but which are "of such a nature [that] an inference of the declarant's state of mind may be drawn"].)

We similarly conclude that Ivan's statements in the video footage after Ward was presented were admissible hearsay under section 1238. Ivan's initial assertions upon seeing Ward ("Um, that was the guy I described at first"; "I think I mixed him up with the first one"; "Was the first") were statements identifying Ward "as a person who participated in a crime" (*id.*, subd. (a)); they were made when the crime was fresh in Ivan's memory (*id.*, subd. (b)); and Ivan confirmed having made the statements under cross-examination by the defense attorney (*id.*, subd. (c)). In his subsequent statements, Ivan expressed equivocation about identifying Ward as the gray-hoodie wearing assailant (". . . they were wearing such similar things. They're both wearing grey hoodies, but they had the hood on, and it was so dark"; "I-do you know how tall he is because I know the only reason I'm more sure of the first one is because he was about my height"; "Can you move him to the side?"; "I'm 5'7"; "He is pretty tall"). These statements were admissible as nonhearsay because they were circumstantial evidence of his uncertainty in choosing between Daryan and Ward, a relevant state of mind. (1 Witkin, Cal. Evid. (6th ed. 2023), Hearsay, § 44, p. 791.) His final statement, "Yeah,

so it's probably the first one [i.e., Daryan] then," was a statement of identification of Daryan and was admissible under section 1238, as all the preconditions for admissibility were met (see *id.*, subds. (a)–(c)).

Ivan's statements when Isaac was presented were admissible on these same grounds—as prior identification evidence under section 1238, and as nonhearsay evidence of Ivan's state of mind, to allow the factfinder to compare Ivan's response to Isaac with his reactions to the other two suspects. Further, statements the police made in Ivan's presence (most of which were questions Officer Taleghani posed to Ivan) were also admissible as nonhearsay for their effect on the listener, Ivan. (§ 1200, subd. (a); *Ramirez, supra*, 13 Cal.5th at p. 1115.)

In sum, the juvenile court erred in excluding the video footage on the ground that it contained inadmissible hearsay. But the People argue we should uphold the juvenile court's ruling as an appropriate exercise of its discretion to exclude cumulative evidence, or because Ivan's statements in the footage were unintelligible. They contend either of these grounds provided an adequate justification for its ruling. We are not persuaded.

First, as Daryan persuasively argues in his reply brief on appeal, these grounds for exclusion are contradictory: "To the extent the juvenile court was unable to hear [Ivan's] statements the first time around (and never reviewed the later provided transcripts), then the court could not have properly exercised its discretion as to their substance[ ] in an informed manner." We agree. "A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination' " and constitutes an abuse of the

31

court's discretion.[4] (*People v. Marsden* (1970) 2 Cal.3d 118, 124; see *Spector v. Superior Court of San Mateo County* (1961) 55 Cal.2d 839, 843–844 [an order entered by a judge without affording the party to be bound with an opportunity "to be heard and to offer evidence" "is lacking in all the attributes of a judicial determination"].)

Second, the video footage was not entirely cumulative of other admitted evidence. For example, by the time the footage was offered as an exhibit, evidence of some of Ivan's most exculpatory statements (e.g., in reference to Ward, "Um, that was the guy I described at first" and "I think I mixed him up with the first one") had been (erroneously) excluded from evidence on hearsay grounds. Furthermore, the footage provided relevant context and showed Ivan as he was viewing the potential suspects, which provided important, nonduplicative information about the credibility of the prior identifications.

For all of these reasons, we conclude the juvenile court erred and abused its discretion when it excluded Officer Taleghani's bodyworn camera footage of the Spring Valley field identification, and in particular, the portion of the video footage that recorded Ivan and Taleghani's statements during the field identification.[5]

---

[4] We observe that the transcript of the video footage contains what is represented to be a true and correct transcription of the statements in the footage and is replete with words attributed to Ivan. It thus stands in contrast with the juvenile court's characterization of Ivan's statements in the footage as "unintelligible."

[5] As we discuss below, we would find the erroneous exclusion of the video footage to be prejudicial on its own. We have discussed the juvenile court's other errors, including their effect on the outcome of the adjudication hearing, so they are not repeated in any subsequent proceeding.

V.

*Daryan Forfeited His Challenge to the Juvenile Court's Ruling Sustaining the Prosecutor's Hearsay Objection During Officer Taleghani's Direct Examination Testimony*

Daryan's next assertion of error arises from Officer Taleghani's direct examination testimony. After defense counsel asked Taleghani to explain why she believed Ivan was "confused" when Ward was shown to him, Taleghani testified Ivan "said that he may have mixed up [Ward] with Daryan . . . because they were wearing similar clothing and it was super dark" and "in the end [Ivan] said he didn't think it was him because . . . Daryan . . . was more his height and so he thought it was Daryan in the end [*sic*]." The prosecutor objected that the response contained hearsay and moved to strike Taleghani's testimony. The juvenile court sustained the objection and granted the motion. Daryan contends the court erred because Ivan's statements were admissible either for their effect on Taleghani or under section 1250's exception for state of mind evidence.

Here, we agree with the People's contention this claim has been forfeited. Because the asserted error involves the exclusion of evidence during the defense's direct examination of its own witness, section 354, subdivision (a), applies. Daryan's trial counsel did not raise nonhearsay or the state of mind hearsay exception as grounds of admissibility at trial. "In these circumstances he is precluded from complaining on appeal." (*Fauber*, *supra*, 2 Cal.4th at p. 854 [claim of evidentiary error forfeited under subd. (a) of § 354 where defendant's counsel failed to argue at trial that the evidence was admissible as nonhearsay]; *Livaditis*, *supra*, 2 Cal.4th at p. 778 [claim of evidentiary error forfeited under subd. (a) of § 354 where defendant's counsel failed to argue at trial that the evidence was admissible under the § 1250 state-of-mind exception to the hearsay rule].)

33

## *Error No. 8*

At the conclusion of the adjudication hearing, when announcing its ruling, the juvenile court stated it had considered the parties' trial briefs and sua sponte admitted them "into evidence by reference." The court then articulated its reasons for finding all counts alleged in the petition to be true. In doing so, the court stated: "Also undisputed is the length of time it took for [Ivan] to identify Daryan as one of his attackers. His quick identification *coupled with his own words of recognizing Daryan's face after, quote, looking him dead in the face, was unprovoked.*" (Italics added.)

But evidence of Ivan's statement during the Spring Valley field identification, "That was the one I looked dead in the face," was not admitted during the adjudication hearing. The statement appears in the transcript of the video footage from Officer Taleghani's bodyworn camera. Yet as we have discussed, the juvenile court excluded the footage from evidence, described Ivan's statements in the footage as "unintelligible," and declined to consider the video transcript. The only other reference in the evidentiary record to someone saying "that's the person I looked dead in the face" is by the prosecutor, while presenting a hypothetical about an unidentified witness during his cross-examination of the defense expert.

However, Ivan's statement about looking one of the suspects "dead in the face" did appear in the prosecution's trial brief. The statement of facts within the prosecution's trial brief included the following factual summary: "When looking at Minor, Victim told Officer Taleghani, 'I recognize that grey hoodie. Yes, that is him. *That was the one I looked dead in the face.*'" (Italics added.)

This characterization of the field identification differs significantly from the transcript of Officer Taleghani's bodyworn camera footage.

Although the transcript reflects that Ivan did say, "That was the one I looked dead in the face," it shows that he did so only after a 30-second pause, and after Taleghani asked him, "That was the one you recognized robbed you?" According to the transcript, he did not make this statement "unprovoked" nor did he say it in connection with the sentences "I recognize that grey hoodie" or "Yes, that is him." The prosecution's trial brief thus portrayed Ivan's identification of Daryan as more immediate and more certain than Ivan's actual words, as transcribed from the video footage, would suggest. And because there was no other evidence of Ivan making a statement about looking Daryan "dead in the face"—no witness testified to the statement during the adjudication hearing, and the footage containing the statement was excluded—the juvenile court's belief that Ivan said these words and did so "unprovoked" had only one possible evidentiary source: the prosecution's trial brief.

On appeal, Daryan challenges the juvenile court's sua sponte ruling admitting the prosecution's trial brief in evidence. Because his trial counsel did not object to the ruling during the adjudication hearing, Daryan must overcome the problem of forfeiture. (§ 353, subd. (a) [a finding shall not be set aside based on the erroneous admission of evidence unless "[t]here appears of record an objection . . . that was timely made and so stated as to make clear the specific ground of the objection"].) Daryan acknowledges his counsel's failure to object and asks us to overlook the resulting forfeiture on the ground the alleged error contributed to violating his rights to due process of law.

For several reasons, we will exercise our discretion to reach the merits of Daryan's appellate challenge. First, the error involves a pure question of law on undisputed facts. (See *People v. Runyan* (2012) 54 Cal.4th 849, 859,

fn. 3 ["we may consider new arguments that present pure questions of law on undisputed facts"].) Second, it is particularly appropriate to consider new arguments on appeal where, as here, "a constitutional right is at stake." (*People v. Jimenez* (2021) 73 Cal.App.5th 862, 874; see *id.* at pp. 874–875 [exercising discretion to consider merits of evidentiary error notwithstanding failure to object at trial in violation of § 353, subd. (a)]; see also Assem. Com. on Judiciary com., 29B pt. 1A West's Ann. Evid. Code (2011 ed.) foll. § 353, p. 599 ["Section 353 is, of course, subject to the constitutional requirement that a judgment must be reversed if an error has resulted in a denial of due process of law."].) Third, the record reflects that the court relied on the improperly admitted prosecution brief in reaching its decision. Under these circumstances, overlooking the forfeiture and considering Daryan's argument on the merits will prevent a miscarriage of justice. Finally, exercising our discretion may "head off a future habeas corpus petition asserting ineffective assistance of counsel." (*Jimenez*, at p. 874.)

Turning to the merits, we agree with Daryan that the juvenile court abused its discretion by admitting the prosecution's trial brief in evidence. "Statements by an attorney, whether made in court or in a brief, *are not evidence*." (*Muskan Food & Fuel, Inc. v. City of Fresno* (2021) 69 Cal.App.5th 372, 389, italics added.) Our Supreme Court has said it is " 'axiomatic' " that an attorney's " 'argument is not evidence.' " (*People v. Stanley* (2006) 39 Cal.4th 913, 961, fn. 10; see CALCRIM No. 200; *People v. Stuart* (1959) 168 Cal.App.2d 57, 60–61 [an attorney's comments are not evidence].) It follows that the court exceeded the scope of its discretion by considering the trial brief as evidence. (*People v. Winkler* (2020) 56 Cal.App.5th 1102, 1154 [action that " ' "transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion" ' "].)

36

The People contend the juvenile court did not err because trial briefs "help the court" and courts are allowed to "consider parties' briefs when adjudicating a case." This overlooks the problem at hand, which is that the juvenile court did not merely "consider" the briefs but admitted them in evidence. Had the court merely considered the briefs for their intended purpose as pieces of advocacy, there would be no difficulty. The problem, of course, is that the court transgressed this boundary, admitted the prosecution's brief in evidence, and then apparently relied on it to decide the facts. These circumstances support the conclusion that the court abused its discretion.

## VII.

### *The Juvenile Court Did Not Apply the Wrong Standard of Proof to the Issue of Identity*

Daryan's last claim of trial error arises from the juvenile court's ruling at the conclusion of the adjudication hearing. In finding true all four counts alleged in the petition, the court stated it was "not persuaded that [Ivan's] identification of Daryan is unreliable or subject to source misattribution." Daryan contends the court's words revealed that it applied the wrong standard of proof on the question of identity, and erroneously required him to disprove his guilt. He notes that the prosecution always bears the burden of proof beyond a reasonable doubt as to a defendant's culpability as a matter of due process. (See *In re Winship* (1970) 397 U.S. 358, 368 [holding the "constitutional safeguard of proof beyond a reasonable doubt is . . . required during the adjudicatory stage of a delinquency proceeding" as a matter of due process].)

We disagree that the juvenile court erred. "[T]he 'same rules apply in ascertaining the meaning of a court order or judgment as in ascertaining the meaning of any other writing.' " (*Estate of Careaga* (1964) 61 Cal.2d 471,

475.) Among the rules governing the interpretation of a writing is the rule that " '[l]anguage in a [court decree or other writing] must be interpreted as a whole, and in the circumstances of the case[.]" (*Dow v. Lassen Irrigation Co.* (2022) 79 Cal.App.5th 308, 326.) "Thus . . . we examine the entire record to determine the scope and effect of a judgment and decree and construe the writing as a whole, rather than interpret individual provisions in isolation." (*Ibid.*)

Applying these principles to the juvenile court's ruling, we conclude the court did not commit burden-shifting error. The court stated at the beginning and end of its decision that it found the prosecution proved all allegations in the petition true beyond a reasonable doubt. As the petition alleged Daryan was a perpetrator of the offenses, these findings necessarily embraced proof of Daryan's identity as a perpetrator beyond a reasonable doubt. The court's statement that it was not persuaded Ivan's identification of Daryan was unreliable or subject to source misattribution paralleled the defense theory with respect to the flaws in the identification. In context, we interpret the court's statement as its explanation why the defense theory did not generate a reasonable doubt in the mind of the court as to whether Daryan was correctly identified as one of Ivan's assailants.

## VIII.
### *The Cumulative Prejudice Resulting from the Juvenile Court's Erroneous Evidentiary Rulings Requires Reversal of the Juvenile Court's Order Finding True the Allegations of the Petition*

Finally, we consider Daryan's last claim, which is that the cumulative effect of the juvenile court's errors deprived him of a fair adjudicatory hearing.

The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349.) The cumulative error doctrine supports reversal where multiple

errors "create[ ] a negative synergistic effect," increasing the overall unfairness to the defendant and rendering it greater than the sum of the individual errors standing alone. (*People v. Hill* (1998) 17 Cal.4th 800, 847.)

The prosecution's only evidence inculpating Daryan was Ivan's eyewitness testimony. Given this circumstance, the case was necessarily a close one. "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. . . .' A commentator has observed that 'the influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor -- perhaps it is responsible for more such errors than all other factors combined.' [Citation.] Suggestion can be created intentionally or unintentionally in many subtle ways." (*United States v. Wade* (1967) 388 U.S. 218, 228–229; see *People v. Cardenas* (1982) 31 Cal.3d 897, 907–910 [reversing judgment under cumulative error doctrine where the only incriminating evidence presented against the defendant was the testimony of two eyewitnesses, which was "inconsistent"].)

Echoing these longstanding principles, Daryan sought to defend himself by challenging the reliability of Ivan's eyewitness identification. His defense was based in part on the expert testimony of Dr. Wixted, which established that identifications made during a showup are less reliable than identifications made during a lineup; and the eyewitness's degree of confidence during the initial identification is the most important determinant of reliability. The eyewitness's confidence, in turn, can be assessed by

39

considering their actual words and the time it takes them to make the identification. According to Wixted, an "immediate" identification "with high confidence is very reliable"; identifications "made with low confidence and with some hesitancy are very unreliable, even if they do land on the suspect."

Dr. Wixted was not familiar with Daryan's case; his testimony about the reliability of eyewitness identifications was generic. Therefore, to fully establish his defense and connect Wixted's opinions to the facts of this case, Daryan needed to present evidence of the Spring Valley field identification so the juvenile court could consider Ivan's actual words and the time it took him to decide which of the suspects were his assailants, and determine the confidence with which Ivan identified Daryan. And because Ivan did not settle on his decision that Daryan was the assailant in the gray hoodie until after viewing Daryan and Ward, the court needed to assess Ivan's reaction to both individuals to fairly decide this issue.

Through its evidentiary errors, the juvenile court eliminated much of this evidence supporting the defense while enhancing the strength of the prosecution's case. First and foremost, the court's erroneous exclusion of the video footage of the Spring Valley field identification (error no. 7) removed a critical piece of defense evidence. Again, "the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness'[s] mind." (*Gould, supra,* 54 Cal.2d at p. 626.) The video footage captured Ivan in real time as he viewed Daryan and Ward for the first time, and recorded Ivan's words and the context in which he said them (in conjunction with the video transcript, the accuracy of which has not been disputed). By excluding the video footage, the juvenile court eliminated the only evidence showing precisely what Ivan

said when viewing each suspect, and when he said it—details that, according to Dr. Wixted, were critical to fully and fairly evaluating the confidence level of Ivan's eyewitness identification.

These details tended to support the defense position that Ivan's initial identification of Daryan was not confident. According to the video transcript, when Ivan was presented with Daryan, he said he recognized Daryan's "grey hoodie"; when asked whether he recognized "the person," Ivan did not give an affirmative response. Instead, he equivocated, saying "Um, it was super dark," "I could've thought he was light skinned" and "I thought he was an African American light skinned." When Ivan was presented with Ward, his first two statements were, "Um, that was the guy I described at first" and "I think I mixed him up with the first one." The reason he gave for confusing Daryan with Ward was that they were "both wearing grey hoodies." It was only after Ivan discussed the suspects' height with Officer Taleghani, and after Taleghani told Ivan she needed "a yes or no for this one [i.e., Ward]" and commented that Ward "looks pretty tall," that Ivan concluded "so it's probably the first one [i.e., Daryan] then."

The video transcript supports the conclusion Ivan's identification of Daryan was based on Daryan's clothing, not "[Daryan's] person," and Ivan changed his mind when he saw Ward wearing what he considered to be similar clothing. Ivan only decided Daryan was the assailant in the gray hoodie after discussing Ward's height with Officer Taleghani and after Taleghani made statements ("I either need a yes or no for this one" and Ward "looks pretty tall") a factfinder could reasonably consider suggestive. Even then, Ivan said it was "*probably* the first one"—Daryan—language that conveyed less than full confidence in his conclusion. (Italics added.)

41

The juvenile court's improper acceptance of the prosecution's trial brief in evidence (error no. 8) compounded the prejudice caused by its erroneous exclusion of the video footage. As best we can discern, the prosecution's trial brief appeared to be the source of the court's finding that it was "undisputed" Ivan's "quick identification coupled with his own words of recognizing Daryan's face after, quote, looking him dead in the face, was unprovoked." This characterization of the field identification varied materially from the transcript of the video footage and strengthened the prosecution's case by making Ivan's initial identification of Daryan seem more reliable.

And although some evidence of Ivan's contemporaneous statements from the Spring Valley field identification was admitted, the juvenile court's erroneous hearsay rulings eliminated Ivan's most concerning statements, further bolstering his apparent reliability as an eyewitness. Specifically, through these rulings the defense was prevented from eliciting that: Ivan's first words when he was asked if he recognized Ward were "that was the guy I described at first" (error no. 1); that Ivan believed he might have been mixing Ward up "with the first [person]" (error no. 2); Officer Taleghani told Ivan that Ward was "pretty tall" (error no. 3); and the last thing Ivan said to Taleghani was that the gray-hoodie-wearing assailant was "probably" the first person he identified (Daryan) (error no. 4).

The People contend no prejudice resulted from these rulings because the defense was able to elicit "essentially the same information" in subsequent questioning of Ivan and Officer Taleghani. For example, they point out that Ivan later testified he "[i]nitially" thought Ward "might have actually been" the assailant in the gray hoodie, and Taleghani testified Ivan "was a little bit confused" when Ward was presented and "brought height into the consideration to make his consideration." We disagree that this evidence

42

fully mitigated the harm caused by the court's erroneous hearsay rulings. According to the defense expert, to determine the confidence of a particular eyewitness identification, one must consider the witness's language as well as the speed of the identification. The subsequent testimony was not an adequate substitute for the eliminated statements because it diluted the sense of uncertainty conveyed by Ivan's actual words which were excluded.

Finally, the juvenile court's other errors—overruling the defense objections to the prosecutor's leading questioning of Ivan (error no. 5), and to Officer Ayster's unprompted speculation that "[t]he victim could easily have construed [the assailant's pants] as black instead of blue" (error no. 6)— further contributed to bolstering the credibility of Ivan's eyewitness identification.

Daryan argues that the cumulative effect of the errors was to violate his right to due process, "each error working synergistically to unfairly ease the prosecutor's path to a conviction." Whether the juvenile court's errors rose to the level of a federal due process violation is a close question. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 294.) "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.)

Courts have recognized that "completely excluding evidence of an accused's defense theoretically could rise to [the level of a constitutional violation]," while "excluding defense evidence on a minor or subsidiary point

43

does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) Errors that rise to federal constitutional dimension are reviewed for harmlessness under "the stricter beyond-a-reasonable-doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18. (*Fudge*, at p. 1103.) If the rulings were " 'error[s] of law merely," the standard of review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 applies. (*Fudge*, at p. 1103.)

Ultimately, we do not need to decide whether Daryan's federal constitutional rights were violated, because we find the juvenile court's errors to be prejudicial even under the less stringent standard that applies to violations of state law. The prosecution's case against Daryan rested entirely on Ivan's credibility as an eyewitness. Because of the court's rulings, Daryan was prevented from developing all of the facts necessary to his challenge to the reliability of Ivan's identification of him as one of the two assailants who robbed him and stole his iPhone and car. Further, in seeking true findings on all four counts in the juvenile petition, the prosecution relied on the theory that Daryan was the assailant in the gray hoodie who aided and abetted the attack that resulted in the theft of Ivan's iPhone and car. On this record, there is a reasonable probability a result more favorable to Daryan would have been reached were it not for the court's errors.[6]

---

[6] We observe that the juvenile court found Daryan both robbed Ivan of his iPhone (Pen. Code, § 211; count 1), and illegally *received* the stolen iPhone (Pen. Code, § 496, subd. (a); count 4). The court further found Daryan both committed felony vehicle theft (Veh. Code, § 10851, subd. (a); count 2), and illegally *received* the stolen vehicle (Pen. Code, § 496d; count 3). Generally, "one may not be convicted of stealing *and* of receiving[ ] the same stolen property." (*People v. Briggs* (1971) 19 Cal.App.3d 1034, 1036; accord *People v. Garza* (2005) 35 Cal.4th 866, 876.) We do not consider the propriety of the

DISPOSITION

The juvenile court's order finding true the allegations in the petition and the court's subsequent dispositional order are reversed.


DO, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.

---

dual adjudications in this case because Daryan has not raised this issue on appeal.